In re SPANISH LAKE
ASSOCIATES, Debtor.

Bankruptcy No. 88–00148–BSS.

United States Bankruptcy Court,
E.D. Missouri, E.D.

Oct. 26, 1988.

Peter D. Kerth, St. Louis, Mo., for debtor.

Carl J. Spector, St. Louis, Mo., for Federal Home Loan Mortg. Corp.

## MEMORANDUM OPINION AND ORDER

BARRY S. SCHERMER, Bankruptcy Judge.

### INTRODUCTION

Spanish Lake Associates, a Michigan partnership (hereinafter the "Debtor") filed a Chapter 11 petition on January 15, 1988. On July 21, 1988, the Debtor filed a Disclosure Statement and a proposed Plan of Reorganization. On September 29, 1988, by leave of Court, the Debtor filed its First Amended Disclosure Statement (hereinafter the "Disclosure Statement") and its First Amended Plan of Reorganization (hereinafter the "Plan"). The Federal Home Loan Mortgage Corporation (hereinafter "Freddie Mac"), the holder of a secured claim, filed an objection to approval of the Plan, and a Memorandum in support thereof. Freddie Mac asserts that the Plan impairs its rights as a creditor under § 1124 and, as a non-consenting creditor, the requirements of § 1129(b) must be met. Since the Plan does not do so as a matter of law, Freddie Mac argues that the Plan cannot be confirmed. The Plan provides for negative amortization of Freddie Mac's claim by deferring payment of post-confirmation interest for seven years. Pursuant to an agreed briefing schedule, the Debtor filed its brief in support of approval of the Disclosure Statement. On October 11, 1988, Freddie Mac filed a reply memorandum in support of its objection to approval of the Debtor's Plan.

In light of the thoroughness with which this issue was briefed, this Court finds oral arguments to be unnecessary.[1] For the reasons set forth below, the Court finds in favor of Freddie Mac and rejects the Debtor's Plan.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151 and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(L).

### FACTS

The facts of this case are not disputed.[2] The Debtor's sole asset is an apartment project located in Spanish Lake, Missouri (hereinafter the "Apartments"). The Apartments are divided into two phases. Phase 1 contains 336 units and is subject to the first lien of Freddie Mac. Freddie Mac's claim as of December 1, 1988, would be $4,347,980.00. The Disclosure Statement assigns a value of $5,000,000.00 to Phase 1.

Phase 2 of the Apartments contains 88 units and is subject to the first lien of First Nationwide Bank (hereinafter "FNB"). FNB's claim as of December 1, 1988, would be approximately $1,156,000.00. The Disclosure Statement assigns a value of $2,100,000.00 to Phase 2.

The Plan provides, in relevant part, that the aggregate principal balance and all accrued but unpaid interest, expenses and reimbursable professional fees shall constitute the post-confirmation principal balance of Freddie Mac's claim (hereinafter the "Allowed Claim"). The Plan further provides that Freddie Mac's Allowed Claim would accrue interest at the rate of 10% per annum. During the first seven years following confirmation, Freddie Mac would not be paid any principal. Nor would it be paid interest at the rate of 10% per annum. Rather, the Debtor would make only interest payments at the following rates:

| Years After Confirmation | Interest Rate Per Annum |
| --- | --- |
| First | 2% |

1. Pursuant to Bankruptcy Rule 3017, a hearing on the approval of the Debtor's Disclosure Statement was held on September 9, 1988. At that hearing the Debtor and Freddie Mac agreed to submit the objection and reply by briefs and not by oral argument unless requested by the Court.

2. For purposes of presenting its objection to the Disclosure Statement only, Freddie Mac has agreed to the valuations and other financial data contained in the Debtor's Plan and Disclosure Statement.

| Years After Confirmation | Interest Rate Per Annum |
|---|---|
| Second | 4% |
| Third | 5½% |
| Fourth | 7% |
| Fifth | 8% |
| Sixth | 9% |
| Seventh | 10% |

All of the deferred interest would be capitalized at 10% per annum one month after the end of each year following confirmation. At the end of the seventh year following confirmation, the Allowed Claim and the post-confirmation deferred and capitalized interest (hereinafter the "ACDCI") would be amortized over a thirty year period at 10% per annum, the balance of which would be due in a balloon payment on December 1, 1999.

Under the Plan, Freddie Mac would retain its first lien on Phase 1 and would be granted a lien junior to FNB on Phase 2. Freddie Mac's claim would remain a non-recourse obligation. Additionally, the Plan states that the Hayman Company, a non debtor affiliate which will continue to manage the Apartments, has agreed to subordinate the payment of its 5% management fee to Freddie Mac's right to the minimum interest payments during the Plan.

Freddie Mac objects to the Plan on the grounds that it violates the standards of § 1129(b)(2)(A)(i)(II) which it reads as requiring that post-confirmation interest payments be paid currently and not be deferred. The Debtor asserts that negative amortization is not prohibited as a matter of law under Chapter 11 and that payment under the Plan satisfies the "fair and equitable" and present value standards of § 1129(b)(2)(A)(i)(II).

DISCUSSION

■ "If the Court can determine from a reading of the plan that it does not comply with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement ..." *In re Pecht,* 57 B.R. 137 (Bankr.E.D.Va. 1986). The Court is not permitted to alter the terms of a plan. It must merely decide whether the plan complies with the requirements of § 1129(b). H.R. No. 95–595, 95th Congress, 1st Session, *reprinted* in 2 App. *Collier On Bankruptcy* (15th Ed.1988). The Debtor asserts, and this Court agrees in the interest of equity, that the Court should view all inferences drawn from the underlying facts and matters contained in the Plan and the Disclosure Statement in a light most favorable to the Debtor.

With that in mind, the Court turns to the issue presented: whether the deferral and capitalization of interest for seven years meets the "fair and equitable" and present value standards of § 1129(b)(2)(A)(i)(II).

■ Section 1129(b)(2)(A)(i)(II) requires a plan containing an impaired, non-consenting, secured creditor to treat such creditor fairly and equitably. Additionally, the subsection provides:

that each holder of a claim of such dissenting class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as the effective date of the plan, of at least the value of such holders interest in the estate's interest in such property.

Generally, the court may confirm a plan over the objections of a class of secured claims if the plan is fair and equitable and if the members of that class receive under the plan property of a value equal to the allowed amount of their claims. The property is to be valued as of the effective date of the plan, recognizing the time-value of money. H.R. No. 95–595, 95th Congress, 1st Session, *reprinted* in 2 App. *Collier On Bankruptcy* (15th Ed.1988). Thus if the proponent of the plan attempts to cram down a class of secured creditors by making deferred cash payments under § 1129(b)(2)(A)(i)(II), the Court is required, inter alia, to value the future cash stream by establishing the present value of the deferred payments provided for under the plan.

The Debtor asserts that payment to Freddie Mac of the ACDCI in the manner prescribed by the Plan produces the same result as if the money were paid to Freddie Mac immediately upon confirmation. So long as the treatment provided to the secured creditors meets the present value

test, the Debtor argues, it makes no economic (monetary) difference whether interest (at 10% per annum) is paid annually or capitalized and paid on December 1, 1999. The Debtor relies on the following cases in support of its position: *In re Pikes Peak Water Company,* 779 F.2d 1456 (10th Cir. 1985); *In re Parker,* 46 B.R. 106 (Bankr.N.D.Ga.1985); *In re Fowler,* 83 B.R. 39 (Bankr.D.Mont.1987); *In re Big Hook Land and Cattle Company,* 81 B.R. 1001 (Bankr.D.Mont.1988). These cases, however, are distinguishable. In *Pikes Peak,* a case decided under Chapter 11, the Court addressed the issue of confirmation pursuant to § 1129(b)(2)(A)(iii). This subsection is not at issue in the instant case. Likewise, in *Fowler,* the Court did not have before it the issue of deferred interest. In *Big Hook,* another Chapter 12 case, the Court held that negative amortization satisfied the requirements of § 1225(a)(5) of the Code.[3] Such a determination, however, was not disputed by Freddie Mac. Finally, the Debtor cites *In re Parker,* a case decided under Chapter 13. In *Parker* the Court addressed the issue of whether the negative amortization aspect of a note rendered the lender's security interest inadequately protected. This is not the issue before the Court today. Thus the cases presented by the Debtor in support of its position are unpersuasive.

■ In addition to relying on the aforementioned cases, the Debtor argues, essentially, that money paid in a lump sum is equivalent to money paid in installments. While the Court acknowledges that a sufficiently large balloon payment on December 1, 1999 may amount to the present value of the debt, the Court believes that the fair and equitable standards of § 1129(b)(2) require consideration of factors in addition to the mathematical accuracy of the computation of payments in the Plan. Section 1129(b)(2) does not state that a plan which satisfies the standards contained in subparagraph (A)(i)(II) is "fair and equitable". It

merely states that the concept of "fair and equitable" as applied to dissenting classes of secured creditors *includes* the treatment contained in § 1129(b)(2)(A)(i)(II). Section 102(3) of the Code states that the words "includes" and "including" as used in the Code are not limiting. Thus, a plan which satisfies the standards set forth in § 1129(b)(2) may or may not be "fair and equitable".

■ Freddie Mac argues that negative amortization of the deferred and capitalized post-confirmation interest never satisfies the "fair and equitable" standards of § 1129(b)(2)(A)(i)(II). (See *In re McCombs Properties VIII, Ltd.,* 91 B.R. 907 (Bankr. C.D.Cal.1988) wherein the Court held that the Debtor cannot defer the very interest payments that create present value and have present value of a stream of deferred principal payments.) This Court, however, is reluctant to place a blanket prohibition on negative amortization and believes the issue should be resolved on a case-by-case basis. Such flexibility was legislated into the Bankruptcy Code by the very fact that terms such as "fair and equitable" resist precise definition.[4] Consequently, in order to assess the merits of the Debtor's Plan, the Court shall consider the following elements:

1. The length of the post-confirmation deferral of interest,

2. The amount of interest to be deferred after confirmation,

3. The amount of principal and interest deferred and capitalized after confirmation,

4. The ratio of debt to value of collateral during the term of the deferral,

5. The nature and quality of the collateral, including consideration of whether the value of the collateral is appreciating, depreciating or remaining relatively stable.

■ Under the Plan, the Debtor does not begin to pay the Allowed Claim ($4,347,-

---

3. The Court notes that both *Fowler* and *Big Hook* were Chapter 12 cases decided by Judge Parker.

4. See e.g. *In re Briggs Transportation Co.,* 780 F.2d 1339, 1348 (8th Cir.1985) wherein the court adopted a flexible approach in arriving at adequate protection requirements.

980.00) until the seventh year following confirmation. On December 1, 1999, the balloon payment of $5,388,685.00 becomes due and owing. This amounts to $1,040,-705.00 over the Allowed Claim; the $1,040,-705.00 being the amount of interest deferred and capitalized during the first seven years of the Plan. Thus the Plan requires almost all of the money due and owing to Freddie Mac to be paid in a lump sum on December 1, 1999, the net effect of which is to coerce an involuntary, post-confirmation loan of $1,040,705.00 for 11 years. See *In re Anderson Oaks Limited Partnership*, 77 B.R. 108 (Bankr.W.D.Texas 1987) wherein the court, in addressing a similar plan to defer payment of interest for five years at 10% per annum, denied the Debtor's plan on the grounds of substantial injustice. Although the *Anderson* case involved a plan confirmation, and not approval of a disclosure statement, the analysis is applicable. In order to ensure payment under the plan, the Debtor must guarantee its projections for the period between confirmation and the date the additional principal generated by the negative amortization would be paid off. See *Anderson* at p. 111. In *Anderson* the Court calculated that it would take twelve years for the level of debt to return to where it was on the date of confirmation. In the instant case it would take eleven years and the Debtor's Plan provides no guarantees to ensure performance of the Debtor's projections.

In fact, the ratio of debt to collateral value on December 1, 1999 may be as high as 86.5%. The Debtor values Phase 1 at $5,000,000.00 and Phase 2 at $2,100,000.00. FNB's claim on December 1, 1999 is approximately $874,500.00, thereby leaving a value of $1,225,500.00 in Phase 2 for the second mortgage to be given to Freddie Mac. Therefore, the total value of the Debtor's property which is to secure Freddie Mac's mortgages on December 1, 1999, would be $6,225,500.00 ($5,000,000.00 value of Phase 1 and $1,225,500.00 value of Phase 2). Since the balloon payment to Freddie Mac on December 1, 1999, would be $5,388,685.00, the ratio of debt to collat-

eral value is estimated at 86.5%. The risk of any shortfall rests with Freddie Mac.

With respect to the nature and quality of the Debtor's property and its future value, the Court notes that the purpose of deferring repayment of the ACDCI is to permit the Debtor to renovate the Apartments which are currently experiencing a 28% vacancy rate. The Debtor projects that by the sixth year of the Plan the vacancy rate will decline to 8%. Freddie Mac, on the other hand, expressed concern that the Apartments will not generate sufficient income in the first five Plan years to make the Plan payments. In its brief Freddie Mac introduced the Debtor's projected balance before debt service. According to the figures presented, the Debtor will incur a $826,354.00 shortfall during the first five years of the Plan. The Debtor's expectation of an 8% occupancy rate is unproven. Consequently, the risk of unfulfilled occupancy expectations again falls on Freddie Mac.

In light of the foregoing, this Court concludes that deferral of the ACDCI for seven years would not be fair and equitable to Freddie Mac, the objecting creditor. Requiring Freddie Mac to wait seven years before the Debtor began paying the full 10% plan interest rate, when the figures presented suggest a risk of financial deficiency, is unduly burdensome.

Although there may be an occasion when deferral and capitalization of the principal and interest would be permissible, this is not such a case. Having premised its case on its ability to force an involuntary refinancing upon an unwilling secured lender, it is incumbent upon the Debtor to demonstrate its ability to meet the standards of cram-down under § 1129(b) of the Code. *Anderson* at p. 111. The Debtor failed to do so. The Plan does not comply with the § 1129(b)(2)(A)(i)(II) ("fair and equitable" and present value) standards. This Court, therefore, declines approval of the Debtor's Plan. *In re Pecht*, 57 B.R. 137 (Bankr.E.D. Va.1986). Accordingly, it is

ORDERED that Freddie Mac's Objection to Approval of Debtor's Disclosure Statement is hereby SUSTAINED and the Debt-

880

or's First Amended Plan of Reorganization is REJECTED.